PULLMAN PALACE CAR CO. *v.* WAGNER PALACE CAR CO. *et al.*, (two cases.)

*(Circuit Court, N. D. Illinois.* January 20, 1891.)

PATENTS FOR INVENTIONS—CAR-BUFFERS—COMITY BETWEEN CIRCUIT COURTS.

In *Pullman Palace Car Co. v. Wagner Palace Car Co.*, 38 Fed, Rep. 416, letters patent No. 373,098, issued November 15, 1887, to the Pullman Company, as assignee of Henry H. Sessions, for an improvement in the connections between cars, was sustained by the circuit court for the northern district of Illinois, mainly on the ground that the buffer-plates of the two cars were kept in contact under constantly opposing spring pressure, while rounding curves as well as upon a straight track, thus to a large extent overcoming the tendency to oscillation. In that suit George M. Pullman filed an affidavit showing that the oscillation was in fact largely overcome by the device, even upon roads of greatest curvature. In *Pullman Palace Car Co. v. Boston & A. R. R. Co., ante,* 195, the subsequent patent, No. 403,137, issued May 14, 1889, to George M. Pullman, for a vestibule connection between cars, in combination with a device similar to that of the Sessions patent, and intended to accomplish the same purpose, and the drawings for which were almost identically the same, was afterwards sustained by the circuit court for the district of Massachusetts upon the ground, among others, that it was not anticipated by the Sessions patent. In this suit Sessions gave testimony in behalf of the Pullman Company, limiting his invention to the exact device described by the specifications, and the Pullman Company contended for a construction thereof which would necessarily prevent the buffer-plates from being in contact under pressure while rounding curves. *Held,* that the Massachusetts decision was inconsistent with the Illinois decision, and therefore comity did not require the Illinois court to enjoin an infringement of the Pullman patent on the strength of the Massachusetts decision.

In Equity.
*Offield & Towle* and *J. S. Runnels,* for complainant.
*George S. Payson,* for defendants.
Before GRESHAM and BLODGETT, JJ.

GRESHAM, J. On May 13, 1887, George M. Pullman filed in the patent-office his application for a vestibule connection for railway cars, and, after several rejections, patent No. 403,137 was granted to him on May 14, 1889. Later in the same year, the Pullman Company, as assignee of the patent, commenced a suit in the circuit court of the United States for the district of Massachusetts against the Boston & Albany Railroad Company for infringement. In October, 1890, that court sustained the patent, and enjoined the defendant, and on the strength of that decree the complainant in this suit insists that it is entitled to a preliminary injunction. On April 29, 1887, Henry H. Sessions filed an application for an improvement on a railroad car, and, after one or more rejections, a patent was issued to the complainant in this suit as assignee of Ses-

sions. This patent was issued on November 15, 1887, and numbered 373,098. A few days later the Pullman Company filed a bill in this court against the Wagner Company for infringement of the Sessions patent, and on April 21, 1889, a decree was entered sustaining the patent and enjoining the defendant.

Under the well-established rule of comity, the decree in the Boston case entitles the complainant to the injunction prayed for, unless the court which rendered that decree gave a construction to the Sessions patent at variance with this court's construction of it. In other words, if the opinion of this court (38 Fed. Rep. 416) cannot be reconciled with the later opinion of the learned circuit judge in the Boston suit, (*ante*, 195,) the complainant is entitled to nothing here on the ground of comity.

In its answer in the Boston suit, the defendant set up (1) that the Pullman patent was void for want of novelty; (2) that the Sessions patent and other patents anticipated it; and (3) that, if they did not anticipate it, the complainant was estopped, by its attitude in the Sessions suit and the decree of the court in that suit, from denying that the Sessions invention was prior to the Pullman invention.

"The object of my invention," says the Pullman specification, "is to provide suitable means whereby there may be made a continuous connection between contiguous ends of passenger railway cars, this connection being an entirely closed passage-way, preferably of the width of the car platforms, and serving at the same time as a vestibule for entrance and exit to the respective ends of the cars, the connection between the solid parts forming a vestibule being made of flexible or adjustable material, so as to constitute a loose or flexible joint that will permit of sufficient movement of each unit car in travel, but at all times preserving a complete vestibule connection between the respective cars. * * * The problem is to hold each bellows so firmly to its car that it will maintain its place when the car is uncoupled from others; *second*, to so support them that when cars are coupled the ends of adjoining bellows or connections take their relative proper positions, so as to form a continuous passage, without any necessity of manipulating the bellows or flexible connections; *third*, to provide a continuous flooring between the cars; *fourth*, so to combine the parts that both the flexible connections and the flooring shall be so supported that the cars may approach nearer and remove further from each other without disturbing either the continuity of the flooring or that of the bellows or inclosed flexible passage-way; *fifth*, that the cars may, as in traveling round curves they must, have the longitudinal line passing through the center of one car at an angle with that passing through the center of another car, without disturbing the continuity of the foot passage, or causing open spaces between the ends of adjoining flexible passage-ways."

The bellows, or accordion-like structure, composed of flexible material, is attached to the outer end of the vestibule and the face-plate, and is thus made capable of conforming to the movements of the cars, which do not always occupy the same relative position. The specification further says:

"The drawings show a buffer-rod and draw-bar of a well-known kind. The buffer-spring, *m*, incloses the buffer-rod, and this rod is moved outward by the spring, and inward by the impact of an adjoining car or buffers connected therewith. Upon this rod is mounted a cross-bar, or equalizing bar,

*l*, in such manner that it can move out and in with the buffer-rod, and at the same time oscillate upon its center as the evener of a wagon does upon the pole. Two rods, *s*, *s'*, are attached to the ends of this cross-bar, *l*, not firmly, but by a sort of ball and socket joint, in such manner that the cross-bar may change its angle to horizontal lines drawn perpendicular to the length of the car, while the rods, *s*, *s'*, always remain substantially parallel with the sides of the car. These rods, *s*, *s'*, pass through mortices or guide-plates made in or supported by the transverse timbers of the car, and are thus confined in such manner that they can slide outward and inward in the direction of their length, but cannot practically move in any other direction. These rods, at their outer ends, project beyond the outer cross-beam of the car, and are there pivoted to the buffer-plate, *n*. This plate is a vertical plate as long as the width of the flexible connection, with its upper edge on a level, or thereabout, with the top of the ordinary platform. A study of the mode of supporting this buffer-plate, as above described, will show that it is pressed out by a spring, that it can be shoved towards the car by the application of sufficient force, and that it can change its angular position with reference to the end of the car when at its extreme outward and inward locations, or anywhere between them. This buffer-plate on one car could not have its acting face coincident with a similar buffer-plate on an adjoining car when the two cars are rounding a curve, unless it could change its angle with reference to a longitudinal line passing through the center of the car, so that it can be at times at right angles to such a line, and at times at various other angles. The support of the buffer-bar before described not only permits these changes of angular position and the in and out motions of the buffer-bar, but prevents its center from leaving a horizontal longitudinal line passing through the center of the car to which it is attached, so that the center of the buffer-bar is always, whether projected or shoved in, practically in line with the center or middle of the platform. The mode of supporting this buffer-bar must be such as to permit it to have these motions so long as the buffer-bar is permitted to move as described, and at the same time to have its center restrained, so that it can move only in a certain path."

The first claim reads:

"The combination, substantially as hereinbefore set forth, of a face-plate forming the open end of a vestibule extension to a railway car when not coupled with another car in a train, and a buffer-plate, which is pivotally connected with a spring-extended buffer-rod, and arranged, as described, to be capable of oscillating on a fixed center, but restrained by guide-rods, as described, to compel the center of oscillation to move only in a line passing longitudinally and horizontally through the center of the car; the said buffer-plate, and the face-plate of the vestibule connected therewith, being free to move angularly with such fixed longitudinal line of their movement."

This claim is for a combination of the face-plate, buffer-plate, and spring buffer-rod with in and out motions and a rocking motion. The chief feature of the invention consists in the loose or pivotal connection of the supporting rods or links at one of their ends to the cross-bar or equalizer, and at their other ends to the buffer-plate; thus allowing the so-called motions and restraint of motion, while the cars oscillate on a fixed center. No other feature of the patent need now be considered.

The Sessions equalizing device is thus described:

"The spring pressure acting against the lower portion of the frame-plate is obtained, as exhibited in the drawings, from the coil-spring, *n*, which takes a bearing at one end against the solid frame-work of the car, and at the other

against a cross-head beneath the entrance platform car, which cross-head, by means of the rigid links, s, s', is connected with the threshold of the frame-plate, a; the said links, s, s', being knuckle-jointed to the threshold-plate, o."

It will be observed that the links are not described as pivoted to the cross-head or equalizer, and the latter is not described as pivoted to the buffer-stem, but the drawings of the patent show such connections.

It is urged by the complainant that this language in the Sessions patent indicates that the equalizing bar is rigidly connected to the buffer-rod, and the supporting rods or links are rigidly connected to the equalizer, and that therefore the face-plate and buffer-plate cannot have the motions and be restrained in the manner described in the Pullman patent. Why were the links knuckle-jointed to the threshold-plate, if it was not intended that they should be pivoted to the equalizer? It is only by keeping the face-plates in constant frictional contact that the declared object of the Sessions invention is, or can be, accomplished. Without the equalizing mechanism shown in his drawings, his plates cannot be thus held together. The pivotal or loose end connection of the links to the threshold-plate suggests, if it does not plainly imply, such a connection of the other ends to the cross-bar or equalizer. Practical mechanics, familiar with the Janney and other buffing apparatus in use at the date of the Sessions patent, would readily have understood how to construct the mechanism with the necessary working play. If the Sessions frame-plates do not oscillate on a fixed center, as do the corresponding plates in the patent in suit, his invention is not capable of accomplishing the beneficial results which this court held it could and did accomplish. If he did not intend that his equalizing mechanism should have the motion, and restraint of motion, described in the later Pullman patent, why did he insert the following language in the descriptive part of his patent?

"It is common experience that, when a train of drawing-room or sleeping cars is traveling at high speed, there is induced in each car a tendency to sway or oscillate laterally. The force which induces this tendency may be relatively a slight matter, but its continued repetition results in an aggregation of impulses, which accelerate the oscillations, and cause unpleasant effects upon the passengers, especially when the road-bed has reverse curves, even of great radius. * * * The effect of my improvement is to provide a resistance to this tendency to oscillation by checking the same at the outset, before the impulses which produce it have accumulated."

This court sustained the Sessions patent on the ground that the equalizing mechanism was capable of keeping the frame-plates in frictional contact, not part of the time, but all the time, on sharp curves, like those of the Baltimore & Ohio road, as well as on tangents; and on the further ground that it was not anticipated by certain prior patents, because their buffing-plates were not kept in such contact, and could not, therefore, at all times oppose the tendency of the cars to sway laterally. The complainant in that suit (and the parties in this suit are the same) insisted that this was the correct construction of the Sessions patent. And yet, in the face of its former ruling, this court is now asked to hold that the Sessions equalizing mechanism will not keep the frame-plates in constant

contact; that in turning curves the plates on the inner side will touch only on their outer edges, while on the outer side of the curve they will not, or may not, touch at all. We do not understand the complainant to insist that the patent can be so construed if the drawings are treated as part of it. The same solicitors prepared both patents and drawings; and, although the latter are exactly alike, it is claimed that they were intended to represent two different equalizing devices. The construction which Sessions now places upon his patent cannot be reconciled with his testimony in the Sessions suit. Mr. Pullman made an affidavit, which was used in support of a motion for a preliminary injunction in the last-named suit, in which he spoke of the operation and effect of the Sessions apparatus as follows:

"These vertical spring-buffers project beyond the vertical planes of the cars, so that on the coupling of the two cars the adjacent frames of the cars compress the springs which back them, and therefore the faces of the plates are held against each other in frictional contact. The result of this construction is that the tendency of the cars of a train, when running at high speed, to have oscillations or vibrations set up, is almost entirely dissipated. * * * As an evidence of the steadiness with which trains run, and their freedom from that oscillatory movement which belongs to all other descriptions of trains when running at high speed, I will state that there is provided in one of the cars of the train a barber's room. The barber's chair in this room is daily occupied by persons who desire to be shaved upon the train; and I state that there is but little more danger or risk in undergoing shaving at the hands of the barber with a common razor on this train, when running at forty miles an hour, than there would be in an ordinary barber's shop in Chicago. I have found that the oscillation of the cars has become greatly diminished in consequence of the application of the spring-friction plates in contact, interposed between the superstructures of adjacent cars of the train, and that the upper berths of sleeping-cars are no longer objectionable on account of the swaying movement."

The Sessions patent, as we are now asked to construe it, would fall far short of accomplishing these beneficial results. In his original application Pullman claimed the vestibule and bellows. He did not there claim what was finally allowed as the distinguishing feature of his patent. In none of his numerous original claims did he embrace the oscillating motion of the arch-plate and the foot-plate. It may be fairly inferred that his first application was prepared with reference to the disclaimer of the vestibule and bellows in the Sessions application. His original application and claims were all canceled, and more than a year after the date of his first application he filed a new specification and claims, and it was in these that he first claimed the equalizing mechanism, with its motions and restraint of motion. This application was rejected February 9, 1889, the commissioner holding that the applicant had not invented a single element; the "particular equalizer" being shown in the Janney and Sessions patents, and the frame-plate in the latter patent. On April 1, 1889, Pullman made and forwarded his affidavit to the patent-office, in which he stated that he had reduced his invention to practice on a train of cars before Sessions filed his application. Some weeks later, the application, which had been rejected on the

ground that the Sessions patent showed the frame-plate and the "particular equalizer," was allowed, and the patent in suit issued. The affidavit did not say that Pullman was the first inventor, and it did not follow that, because he first reduced the invention to practice, he, and not Sessions, first perfected the invention. It did not deny that the Sessions patent showed the "particular equalizer;" on the contrary, its presentation amounted to an acquiescence in the correctness of the commissioner's ruling on that point, and a claim that Pullman was entitled to a patent because he was the first inventor.

We have referred to the fact that the parties to this suit were the litigants in the Sessions suit. In the latter suit the complainant obtained a decree, on the theory that Sessions was the first inventor of the equalizing mechanism for which a patent was finally granted to Pullman. That decree remains in force. It is chiefly on the testimony of Sessions in this suit and the Boston suit this court is now asked to hold that he was not the first inventor. That testimony cannot be reconciled with material portions of the testimony of the same witness in the Sessions suit. To what extent, if at all, the decree in the Sessions suit is conclusive upon the complainant in this suit is a question which we prefer to reserve until the final hearing. Injunction denied.